# Supreme Court of Texas

No. 22-0978

In the Interest of R.R.A., H.G.A., H.B.A., Children

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

JUSTICE BLACKLOCK, joined by Justice Busby, dissenting.

Texas's child welfare system has many problems. The underlying problem is that far too many parents in Texas are woefully incapable of caring for their children. The reason almost always involves drugs, frequently methamphetamine. If we could rid our society of the scourge of these drugs, the benefit to the children of Texas—particularly the poorest and most vulnerable children—would be incalculable. We could try much harder to do this for our children, but we do not. Our inability to win the long-running "war on drugs" is a failure of will. It can be done, but obviously not in the way we are doing it.

Until we get far more serious about protecting families and children from addictive, destructive substances like methamphetamine, there will be no shortage of Texas children in desperate circumstances with nowhere to turn for help but the government. Our child welfare system struggles to accommodate this terrible demand. The system's

difficulty handling the volume of children in its custody is well documented.[1]  One solution to the volume problem, of course, would be to focus resources on the worst cases, cases in which abused or neglected children have suffered the dire consequences of their parents' terrible failures.  Sadly, there is no shortage of such cases.  Resources spent on marginal cases—in which a troubled family has thus far cared adequately for its children but the government suspects this may not continue—are resources not spent ensuring that the many children already facing acute abuse or neglect are well cared for when the State must assume the grave responsibility of taking them into its custody.

This was just such a marginal case.  Unlike the majority, I have no quarrel with the court of appeals' eminently reasonable decision to reverse the termination of this father's rights.  654 S.W.3d 535, 556 (Tex. App.—Houston [14th Dist.] 2022).

\* \* \*

The father in this case used methamphetamine, and the government's concern about his drug use was understandable.  But CPS never observed the children themselves to be anything other than healthy and happy.  This father clearly loves his children, despite his problems.  He obviously needed help caring for them, and he got that help from his mother, the children's grandmother.  He got no help from the children's mother, whose meth addiction appears to have been more debilitating than his.  Unlike so many men in similar circumstances who

---

[1] *See, e.g., M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 258 (5th Cir. 2018) ("The combination of unmanageable caseloads and high caseworker turnover [at the Texas Department of Family and Protective Services] creates a 'cycle of crisis' that allows children to 'fall through the cracks.'").

abandon their children to fatherlessness, this father remained. His children did not have a model father, but they had a father. They also had a grandmother. And by all accounts, they were clean, healthy, and well-fed. There were no clear signs of abuse or neglect. Their family was far from ideal, but it was a family.

At one point, the best the father could do was to sleep in his truck with his children for a short time. Were the children hungry, desperate, dirty, or in danger at this time? There is no evidence of that. The evidence is that their grandmother was nearby and was consistently involved in their care. When CPS arrived to investigate the allegation that the children were living with their father in his truck, the children were found to be healthy and living with their grandmother. No positive drug test indicates that the father was impaired during the time that he and his children slept in his truck. The children were removed when the father later tested positive for meth, but there is no indication that their living arrangement at that time, with their grandmother, endangered them. To the contrary, at the CPS visit that precipitated the children's initial removal into state custody, CPS observed the children to be "clean and eating pizza" in their grandmother's care.

At a later point, the grandmother was hospitalized for an illness, which left the father alone to care for the children. This violated restrictions on the father's visitation that had been imposed after the first removal. When the authorities arrived, they found an unidentified woman with meth paraphernalia at the grandmother's house. They arrested her and took the children. Father, however, tested *negative* for drugs a few days later—so any suggestion that he was doing drugs with

the arrested female visitor instead of caring for his children is not supported by evidence. There is no clear and convincing indication that these children had been abused or neglected *in any way* at the time they were last taken from their father—or at any other time in their father's or their grandmother's care.

The Family Code presumes that not all drug use by parents endangers children so as to warrant termination of parental rights. Section 161.001(b)(1)(P) authorizes termination of parental rights when the parent has "used a controlled substance . . . in a manner that endangered the health or safety of the child." TEX. FAM. CODE § 161.001(b)(1)(P). This provision only makes sense if some uses of a controlled substance by a parent do not endanger the health or safety of children in a way that warrants termination.

The allegation against this father at the time of the children's initial removal was that he routinely snuck out of the grandmother's house to use meth while his mother cared for his children. Hardly the behavior of a good parent, but how exactly does it endanger the children, who remain with their capable grandmother? Where is the clear and convincing evidence that, at any particular point in time, these children were endangered by the way their family cared for them? A damning litany of the father's sins fills the majority opinion, but there is no mention of any moment in these children's lives at which we can say with confidence that they suffered a particular harm or faced a particular danger. Instead, we have only suspicion and inference about the generalized dangers associated with parental addiction and instability. This is no substitute for clear and convincing evidence

4

showing how and when *this father* endangered *these children* to a degree that warrants judicial termination of his legal fatherhood.

The government's theory of the case seems to be that the father's drug addiction *itself* is sufficiently endangering to the children to warrant termination. That is not enough under subsection (P), which requires clear and convincing evidence of the way *these children* were endangered by *this drug use*—not generalized concerns that drug addiction is incompatible with good parenting. Drug addiction obviously *is* incompatible with good parenting, but when the addicted parent has enough good judgment to lean on more responsible family members for support, as this father did, then the addiction itself has not necessarily endangered the children.

"[I]nvoluntary termination statutes" should be "strictly construed in favor of the parent." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). The Court's expansive approach to the pivotal statutory word "endangered," however, has trended in the opposite direction and now seems fully divorced from the discrete sense in which the statute uses the word. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (P). This is a statute about the judicial destruction of families. The question it asks is whether children have experienced the kind of endangerment that justifies the forcible dissolution of a family by the government. The question is not whether the factfinder or the appellate court can imagine bad things happening to these children if they remain with their family.

In any non-ideal family situation—whether poverty, homelessness, drugs, living in a rough neighborhood, etc.—the children will face many dangers not faced by children in more ideal

environments. This does not make their parents eligible for the civil death penalty under the Family Code. *See In re D.T.*, 625 S.W.3d 62, 69 (Tex. 2021) (describing parental termination as the "death penalty" of civil cases). Properly understood, the statute requires clear and convincing evidence of endangerment *that warrants the extraordinary remedy of termination.* This surely means, at a minimum, that the children have actually suffered significant harm or have blessedly avoided significant harm despite being exposed to extraordinarily dangerous conditions by their parents. I see no such evidence here.

The court of appeals was justified in reversing the judgment of termination under the less deferential "clear and convincing evidence" standard. Under that standard, the "inferences" upon which the majority relies should not be allowed. *See ante* at 14 ("A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being . . . ."). An inference is not clear evidence. Nor are mere inferences convincing enough to support the awesome remedy of parental termination.

* * *

Discussion by judges and lawyers of "parental termination" can obscure an important truth. Civil human authorities may have the power, in extreme cases, to forcibly sever the legal bond between a parent and a child. But the relationship between parent and child is far more than a legal construct. Parents and their children are "bound together by natural ties deeper and stronger than any law." *See In re A.M.*, 630 S.W.3d 25, 25 (Tex. 2019) (Blacklock, J., concurring in denial). This natural bond cannot be severed by decree of an earthly government.

6

Even if the court of appeals did not perfectly apply this Court's questionable precedent on child endangerment, we should nevertheless have denied this petition. It is not important to the jurisprudence of Texas that we reinstate the termination of this father's rights. There are many, too many, problems with our child welfare system. An overabundance of successful appeals by parents whose rights have been terminated is not among those problems. This Court received petitions in roughly 356 parental-termination cases in 2022 and 2023. Nine of those petitions were filed by the government. The other 98 percent were filed by parents who lost in the court of appeals. Most of these cases involve families that have already destroyed themselves as a matter of fact by the time the State makes their destruction official as a matter of law.

This was not such a case. This father fought for his family on appeal, and against great odds, he won. Leaving the court of appeals' judgment alone would not have left these children uncared-for, and it would not have prevented the government from continuing to monitor their welfare. We should have let the court of appeals' decision stand and focused our attention elsewhere.

I would therefore have denied the petition for review. The Court having granted it, I would dismiss it as improvidently granted. Failing that, I would affirm the judgment of the court of appeals reinstating this father's rights. Because the Court does otherwise, I respectfully dissent.

James D. Blacklock
Justice

7

**OPINION FILED:** March 22, 2024